**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON**

| | | |
|---|---|---|
| TED ALLEN, | : | Case No. 3:16-cv-474 |
| Plaintiff, | : | |
| vs. | : | District Judge Walter H. Rice |
| | : | Magistrate Judge Sharon L. Ovington |
| NANCY A. BERRYHILL, COMMISSIONER OF THE SOCIAL SECURITY ADMINISTRATION, | : | |
| Defendant. | : | |

**REPORT AND RECOMMENDATIONS[1]**

## I. Introduction

Plaintiff Ted Allen applied for Disability Insurance Benefits on August 5, 2013, asserting he could no longer work a substantial paid job due to his mental and physical impairments. The Social Security Administration denied Plaintiff's claims initially and upon reconsideration. Following an administrative hearing, Administrative Law Judge (ALJ) Eric Anschuetz concluded that Plaintiff was not eligible for benefits because he is not under a "disability" as defined in the Social Security Act. Plaintiff brings this case challenging the Social Security Administration's denial of his application for Social Security benefits.

---

[1] Attached is a NOTICE to the parties regarding objections to this Report and Recommendations.

The case is before the Court upon Plaintiff's Statement of Errors (Doc. #7), the Commissioner's Memorandum in Opposition (Doc. #8), Plaintiff's Reply (Doc. #9), and the administrative record (Doc. #6).

Plaintiff seeks a remand of this case for payment of benefits or, at a minimum, for further proceedings. The Commissioner asks the Court to affirm ALJ Anschuetz's non-disability decision.

## II. Background

Plaintiff asserts that he has been under a "disability" since April 9, 2013. He was thirty-nine years old at that time and was therefore considered a "younger person" under Social Security Regulations. *See* 20 C.F.R. § 404.1563(c). He has a high school education. *See* 20 C.F.R. § 404.1564(b)(4).

### A. Plaintiff's Testimony

Plaintiff testified at the hearing before ALJ Anschuetz that he cannot work because he has "left eye, vision issues, [is] numb below the waist down, unstable, [and] clumsy, [he has] head pain, hearing loss, [and] back pain, [his] hands don't work that much anymore, [he has problems with] grasping, [has] loss of strength, [has trouble] standing for a period of time[,]" and experiences fatigue. (Doc. #6, *PageID* #76). "The biggest problem I've been having has been my waist down to my toes. It will get burning feelings and the next thing you know, I can see my legs, but I can't feel them at all." *Id.* at 96.

Plaintiff was first checked out for symptoms of multiple sclerosis (MS) in 2005, after he had Lasik eye surgery and they discovered optical neuritis in his left eye. *Id.* at

94-95. In 2010, when Plaintiff's father died, the severity of his MS increased and he began to have flare-ups more frequently. *Id.* at 95, 98.

Plaintiff sees his primary-care physician, Dr. Moore, the most often. *Id.* at 77. In a six-month period, Plaintiff usually sees him three to four times for head pain and any smaller issues. *Id.* Plaintiff also sees a neurologist, Dr. Mankowski. *Id.* Plaintiff sees Dr. Mankowski's nurse once a month for Tysabri infusions. *Id.* Plaintiff spent the three days before the hearing at Dayton Center of Neurology Disorders getting steroid treatments "to help calm down the symptoms I've been having with the numbness going down my legs and my waist down and the head pain and things like that going on with my body." *Id.* at 77-78.

In the past, Plaintiff has taken prednisone to help with his symptoms as well as Avonex. *Id.* at 79. The medicine Plaintiff was using at the time of the hearing—Tysabri—"is actually a more potent medication for MS and they don't like to use steroids as much unless you're having a major flare-up." *Id.* at 80. Plaintiff takes Lyrica for nerve pain. *Id.* at 84.

To improve his condition, Plaintiff tries to "stay stress-free" and "not overheat." *Id.* at 85. Overheating causes him to have MS flare-ups: "It will actually cause flare-ups actually in the brain to the point that my vision will go about 90% gone in my left eye, to the point I can barely walk, once that happens either you go for a steroid injection or you're going to be down for a good week or two." *Id.* at 85-86. "A flare basically … you can actually start feeling – you kind of start sweating a little bit or you feel burning going through sections of your body. And the next thing you know, you can't feel parts

of your body or your vision just totally leaves." *Id.* at 96. Plaintiff has a minimum of five flares a week. *Id.* at 93. They can last anywhere between thirty minutes and an entire week. *Id.* They happen most often between 9:30 p.m. and 11:30 p.m. *Id.* at 97. While having a flare, he is not able to do any activities and has to lie in bed. *Id.* at 93. And, between flares, he struggles with fatigue. *Id.*

Plaintiff lives in a split-level house with his wife and five children—ages 15, 12, 9, 6, and 5. *Id.* at 82. He does not regularly exercise but he will walk around his front yard when his children are out playing. *Id.* at 81. He walks between fifty and sixty feet. *Id.* He has a driver's license and usually drives two to three times a week to Kroger's or Walgreens. *Id.* at 81-82.

On school days, Plaintiff usually wakes up around 6:30 a.m. to help his kids get ready for school. *Id.* at 89. After they leave, he usually lies back down or watches the news. *Id.* During the day, he does little things around the house. *Id.* at 90. He sometimes starts laundry, cleans up small messes, and runs quick errands. *Id.* He watches television for up to two and a half hours a day. *Id.* During daytime hours, even when he is not experiencing a flare, he spends approximately sixty percent of his time lying in bed, trying to relax. *Id.* at 94.

Plaintiff last worked at his wife's HVAC company in July 2013. *Id.* at 67. She operated the business out of their house, and he helped her find contractors. *Id.* She did not pay him. *Id.* at 69-70. He estimated that he worked twenty to twenty-five hours per week and if she had paid him, he would likely have made twenty-five dollars an hour. *Id.* at 70. The ALJ asked what happened on the date Plaintiff alleges his disability began—

4

April 9, 2013—and Plaintiff explained, "my wife's company pretty [much] crashed and no income's really coming in and we both decided, … we're going to have to make adjustments and you need to file for disability." *Id.* at 72.

> B. Medical Opinions
>
> > i. Matthew Moore, M.D.

On June 25, 2013, Plaintiff's treating physician, Dr. Moore, provided a brief statement. *Id.* at 362. He indicated that he had treated Plaintiff for over thirty years and opined, "He has multiple sclerosis. It is progressively getting worse to the point that he is now on [IV] therapy. [Plaintiff] has also been seen for depression/anger issues and has been referred to a therapist. [Plaintiff] is considering disability and I am supporting him in this matter." *Id.*

Dr. Moore also completed a questionnaire regarding Plaintiff's MS on July 17, 2014. *Id.* at 420-21, 431-32. He identified an abundance of problems applicable to Plaintiff: MRI showing plaques characteristic of MS; CSF abnormalities; ataxia; numbness; weakness; double vision or other visual disturbances; vertigo; paresthesias; other emotional disturbances; sustained disturbance of gait and station; and significant, reproductive fatigue of motor function with substantial muscle weakness on repetitive activity, demonstrated on examination. *Id.* at 420. Dr. Moore opined Plaintiff could not work at all. *Id.* Plaintiff could, however, stand for thirty minutes at one time, lift five pounds on an occasional basis, and use his arms to work occasionally. *Id.* Further, Plaintiff would be off task twenty percent or more of the day. *Id.* at 421. Dr. Moore opined Plaintiff has a significant problem with anxiety and/or depression that would

markedly limit his ability to withstand the stresses and pressures of ordinary work activity. *Id.*

### ii. Kenneth Mankowski, D.O.

Dr. Mankowski, Plaintiff's treating neurologist, also completed a questionnaire on multiple sclerosis. *Id.* at 422-23. He recognized the following as applicable to Plaintiff: MRI showing plaques characteristic of MS; positive Babinski; CSF abnormalities; ataxia; numbness; weakness; stiffness; paresthesias; sustained disturbance of gross and dexterous movements; sustained disturbance of gait and station; significant, reproductive fatigue of motor function with substantial muscle weakness on repetitive activity, demonstrated on examination; and inability to ambulate effectively. *Id.* at 422. Dr. Mankowski opined Plaintiff could work for two hours in one day, stand for fifteen minutes at one time; stand for a total of one hour in a workday, lift five pounds on a frequent basis, and use his arms to work occasionally. *Id.* Additionally, Plaintiff would be off task twenty percent or more of the day. *Id.* at 423. Dr. Mankowski noted, "active multiple sclerosis requiring monthly Tysabri–Severe gait dysfunction, fatigue, etc." *Id.*

### iii. Steve McKee, M.D., & William Bolz, M.D.

Dr. McKee reviewed Plaintiff's records on September 26, 2013. *Id.* at 112-22. He opined Plaintiff could lift and/or carry twenty pounds occasionally and ten pounds frequently. *Id.* at 118-19. He could stand and/or walk for a total of four hours and sit for a total of six hours. *Id.* at 119. He could occasionally climb ramps/stairs, balance, stoop, kneel, crouch, or crawl and never climb ladders, ropes, or scaffolds. *Id.* He should avoid

all exposure to hazards such as machinery and heights. *Id.* Dr. McKee concluded that Plaintiff is not disabled. *Id.* at 121-22.

On February 26, 2014, Dr. Bolz reviewed Plaintiff's records and confirmed Dr. McKee's assessment. *Id.* at 124-36.

### III. <u>Standard of Review</u>

The Social Security Administration provides Disability Insurance Benefits to individuals who are under a "disability," among other eligibility requirements. *Bowen v. City of New York,* 476 U.S. 467, 470 (1986); *see* 42 U.S.C. § 423(a)(1). The term "disability"—as defined by the Social Security Act—has specialized meaning of limited scope. It encompasses "any medically determinable physical or mental impairment" that precludes an applicant from performing a significant paid job—i.e., "substantial gainful activity," in Social Security lexicon. 42 U.S.C. § 423(d)(1)(A); *see Bowen,* 476 U.S. at 469-70.

Judicial review of an ALJ's non-disability decision proceeds along two lines: "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007). Review for substantial evidence is not driven by whether the Court agrees or disagrees with the ALJ's factual findings or by whether the administrative record contains evidence contrary to those factual findings. *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2014); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). Instead, the ALJ's factual findings are upheld if the substantial-evidence standard

is met—that is, "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance . . . ." *Rogers*, 486 F.3d at 241 (citations and internal quotation marks omitted); *see Gentry*, 741 F.3d at 722.

The other line of judicial inquiry—reviewing the correctness of the ALJ's legal criteria—may result in reversal even when the record contains substantial evidence supporting the ALJ's factual findings. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F.3d at 746. "[E]ven if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting in part *Bowen*, 478 F.3d at 746, and citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004)).

**IV.** **The ALJ's Decision**

As noted previously, it fell to ALJ Anschuetz to evaluate the evidence connected to Plaintiff's application for benefits. He did so by considering each of the five sequential steps set forth in the Social Security Regulations. *See* 20 C.F.R. § 404.1520. He reached the following main conclusions:

Step 1: Plaintiff has not engaged in substantial gainful employment during the period from his alleged onset date of April 9, 2013 through his date last insured of December 31, 2014.

8

| | | |
|---|---|---|
| Step 2: | | He has the severe impairments of multiple sclerosis and cervical and lumbar degenerative disc disease. |
| Step 3: | | He does not have an impairment or combination of impairments that meets or equals the severity of one in the Commissioner's Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1. |
| Step 4: | | His residual functional capacity, or the most he could do despite his impairments, *see Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002), consists of "light work … except: the claimant is able to lift and carry 20 pounds occasionally and 10 pounds frequently. He can stand and/or walk for 6 hours in an 8-hour workday. He can sit for a total of 6 hours in an 8-hour workday. He can never climb ladders, ropes, or scaffolds, but he can occasionally climb ramps and stairs. He can occasionally balance, stoop, kneel, crouch, and crawl. The claimant can never work in a fast-paced environment and needs an office setting or limited work area. He can never be exposed to extreme heat or cold in a work environment. Furthermore, he must have the option [to] sit or stand at will during the workday." |
| Step 4: | | He is unable to perform any of his past relevant work. |
| Step 5: | | He could perform a significant number of jobs that exist in the national economy. |

(Doc. #6, *PageID* #s 43-55). These main findings led the ALJ to ultimately conclude that Plaintiff was not under a benefits-qualifying disability. *Id.* at 55.

## V. Discussion

Plaintiff contends that the ALJ erred in rejecting Plaintiff's treating physicians' opinions while embracing the opinions of the State agency consultants. Further, his residual functional capacity assessment is not based on substantial evidence because the ALJ failed to account for Plaintiff's non-severe mental impairments, posed an incomplete hypothetical to the vocational expert, and applied the incorrect standard to Plaintiff's claim. The Commissioner maintains that the ALJ properly weighed the medical opinions

9

of record and properly considered Plaintiff's mental impairments and work activities. Further, the Commissioner asserts that the omission of the limitation from the hypothetical question to the vocational expert was harmless error.

### A. Medical Opinions

Social Security Regulations require ALJs to adhere to certain standards when weighing medical opinions. "Key among these is that greater deference is generally given to the opinions of treating physicians than to those of non-treating physicians, commonly known as the treating physician rule." *Rogers,* 486 F.3d at 242 (citations omitted). The rule is straightforward:

> Treating-source opinions must be given "controlling weight" if two conditions are met: (1) the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques"; and (2) the opinion "is not inconsistent with the other substantial evidence in [the] case record."

*Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (quoting in part 20 C.F.R. § 404.1527(c)(2)); *see Gentry*, 741 F.3d at 723.

If the treating physician's opinion is not controlling, "the ALJ, in determining how much weight is appropriate, must consider a host of factors, including the length, frequency, nature, and extent of the treatment relationship; the supportability and consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors." *Rogers*, 486 F.3d at 242 (citing *Wilson*, 378 F.3d at 544).

The Regulations also require ALJs to provide "good reasons" for the weight placed upon a treating source's opinions. *Wilson*, 378 F.3d at 544. This mandatory "good reasons" requirement is satisfied when the ALJ provides "specific reasons for the

10

weight placed on a treating source's medical opinions." *Id*. (quoting Soc. Sec. R. 96-2p, 1996 WL 374188, at *5 (Soc. Sec. Admin. July 2, 1996)).[2] The goal is to make clear to any subsequent reviewer the weight given and the reasons for that weight. *Id*. Substantial evidence must support the reasons provided by the ALJ. *Id*.

The ALJ's decision in the present case did not describe the legal criteria applicable to weighing the opinions of treating physicians or other medical sources. Instead, he merely stated that he "considered opinion evidence in accordance with the requirements of 20 CFR 404.1527 and SSRs 96-2p, 96-5p, 96-6p and 06-3p." (Doc. #6, *PageID* #47). Without a description of the legal criteria actually applied by the ALJ, the ALJ's decision must be scrutinized to determine whether he "applied the correct legal criteria" when weighing the medical source opinions. *Bowen,* 478 F.3d at 745-46. Doing so reveals that he did not.

ALJ Anschuetz assigned little weight to both of Dr. Moore's opinions. First, he discussed Dr. Moore's single paragraph opinion, finding that Dr. Moore's opinion is "not supported by his medical records[.]" (Doc. #6, *PageID* #53). He explained, "Most of Dr. Moore's treatment notes discuss routine illnesses and injuries to the claimant and only infrequently mention investigation into whether or not the claimant has multiple sclerosis. Dr. Moore's treatment notes include notations that he did assess the claimant as having MS, but neurologically the claimant is negative for weakness, numbness, and headaches, although the claimant complained of dizziness." *Id.*

---

[2] Soc. Sec. R. 96-2p was rescinded. *See* FR vol. 82, No. 57, p. 15263, effective March 27, 2017. At the time of the ALJ's decision in this case, Soc. Sec. R. 96-2p was still in effect.

11

It is not clear from the ALJ's language whether he was referring to the first condition of the treating physician rule—whether the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques—or supportability as a factor. Either way, the ALJ's conclusion is not supported by substantial evidence.

It is not reasonable for the ALJ to discount Dr. Moore's opinion because he treated Plaintiff's "routine illnesses and injuries"; Dr. Moore is Plaintiff's family-care physician. And, the ALJ does not acknowledge that Dr. Moore's treatment notes include examination findings from other physicians—specialists—that treated Plaintiff for MS and related symptoms. For example, Dr. Moore's treatment notes include notes from Walter C. Hartel, M.D.—a specialist in neuro-ophthalmology orbital surgery; Howard S. Rossman, D.O., F.A.C.N.—a neurologist; and Donald L. Wamsley, M.D.—a neurologist. *Id.* at 407-10. It also includes lab results and medical imaging results. *Id.* at 393-402.

Further, Dr. Moore's treatment notes support his opinion. Dr. Moore's documentation of Plaintiff's MS and associated symptoms begin in June 2005, when Dr. Moore noted Plaintiff's blurred vision—ten weeks after he had Lasik eye surgery. *Id.* at 391. When Plaintiff's vision problems persisted, Dr. Moore ordered an MRI. *Id.* at 388. The MRI revealed multiple high density signal lesions, Dr. Moore indicated Plaintiff may have MS, and he referred Plaintiff to neurology. *Id.* Dr. Moore's notes then discuss Plaintiff's MS occasionally but not every visit. This is consistent with Plaintiff's ability to engage in some work activities at that time. Then, in June 2013, Dr. Moore's notes focus more on Plaintiff's MS. For example, Dr. Moore noted, "MS flaring, now on IV therapy. … Considering disability." *Id.* at 331. Plaintiff was also experiencing fatigue,

visual disturbance, dizziness, and a dysphoric mood. *Id*. In June and September 2014, Dr. Moore's notes concerning Plaintiff's MS continue. He noted, for instance, "MS worse – vision, dizziness, heat intolerance – considering disability." *Id.* at 425. This supports Plaintiff's alleged disability onset date of April 9, 2013.

The ALJ does quote language from the second condition of the treating physician rule—whether the opinion is not inconsistent with the other substantial evidence. He finds that Dr. Moore's opinion "is not inconsistent with other medical evidence[.]" *Id.* at 53 (citing Ex. 7F/3 [*PageID* #331], 12F [376-419], 7F [329-34], 15F [424-32]). Presumably, based on the "little weight" he assigned, the ALJ meant that Dr. Moore's opinion is inconsistent with other medical evidence. Notably, however, the ALJ did not identify any inconsistent evidence, and the only evidence the ALJ cites is Dr. Moore's own treatment notes. Without more, the Court cannot engage in a meaningful review of the ALJ's decision because his reasoning is not "sufficiently specific to make clear … the weight [he] gave to the treating source's medical opinion and the reasons for the weight." Soc. Sec. R. 96-2p, 1996 WL 374188, at *5.

However, even if Dr. Moore's opinion is not entitled to controlling weight under the treating physician rule, the ALJ's review is not complete. "Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 CFR 404.1527 . . . ."). Soc. Sec. R. 96-2p, 1996 WL 374188, at *4.

The ALJ only provides one other reason for rejecting Dr. Moore's opinion—he questions Dr. Moore's statement that he has been treating Plaintiff for thirty years. The ALJ observes that the Plaintiff was 39 years old at the time of the opinion, implying

that—if Dr. Moore had actually been treating Plaintiff for thirty years—Plaintiff would have only been nine to ten years old when Dr. Moore began treating him. The ALJ further observes that the treatment notes Dr. Moore provided begin in 2004.

It is unreasonable for the ALJ to assume that Dr. Moore had not treated Plaintiff for approximately thirty years. There was no reason for Dr. Moore's office to provide *all* of Dr. Moore's treatment notes because Plaintiff alleges his disability began in April 2013. Further, Plaintiff was not diagnosed with MS until 2006. The ALJ does not mention the note from March 8, 2007 where Dr. Moore indicates "I HAVE KNOWN HIM SINCE HE WAS A TEENAGER …." (Doc. #6, *PageID* #385 (capitalization in original)). And, the ALJ does not identify any evidence to the contrary. Accordingly, the ALJ's finding is not supported by substantial evidence.

The ALJ then briefly discusses Dr. Moore's second assessment—a "mere a handwritten response to a check-off questionnaire." *Id.* at 53 (citation omitted). He explains the problems associated with form opinions:

> Form reports in which a physician's obligation is only to check a box or fill in a blank, without explanations of the examining physician's medical conclusions are weak evidence at best. Where these reports are unaccompanied by thorough written reports, the reliability is suspect. An acceptable medical opinion as to disability must contain more than a mere conclusory statement that the claimant is disabled. It must be supported by clinical or laboratory findings.

*Id.* He then—in a mere conclusory statement—finds that "there are specific and legitimate reasons to reject Dr. Moore's unreasonably restrictive assessment." *Id.* ALJ Anschuetz's limited analysis of Dr. Moore's opinion does not adequately address the

14

treating physician rule. Additionally, he failed to weigh Dr. Moore's opinion under the required factors. *See Rogers,* 486 F.3d at 242 ("[I]n all cases there remains a presumption, albeit a rebuttable one, that the opinion of a treating physician is entitled to great deference, its non-controlling status notwithstanding.") (citation omitted). The ALJ's conclusory statement does not constitute "good reasons" for discounting Dr. Moore's opinion.

In a very similar fashion, the ALJ assigned Dr. Mankowski—Plaintiff's treating neurologist—"little weight." (Doc. #6, *PageID* #53). He provides a short explanation: "This is also a handwritten response to a checklist questionnaire. It does not contain medical analysis and his treatment records of the claimant do not support Dr. Mankowski's opinion[.]" *Id.* (citation omitted). The ALJ does not address the treating physician rule or any of the factors. "The failure to provide 'good reasons' for not giving [a treating physician's] opinions controlling weight hinders a meaningful review of whether the ALJ properly applied the treating-physician rule that is at the heart of this regulation." *Gayheart,* 710 F.3d at 377 (citing *Wilson,* 378 F.3d at 544).

The ALJ also very generally asserts,

> The possibility always exists that a doctor may express an opinion in an effort to assist a patient with whom he or she sympathizes for one reason or another. Another reality, which should be mentioned is that patients can be quite insistent and demanding in seeking supportive notes or reports from their physicians, who might provide such a note in order to satisfy their patients requests and avoid unnecessary doctor/patient tension. While it is difficult to confirm the presence of such motives, they are more likely in situations where the opinion in question departs substantially from the rest of the evidence of record, as in the current case.

(Doc. #6, *PageID* #53). These observations by the ALJ are questionable in this case, given the remarkable consistency between Plaintiff's treating physicians' opinions. The ALJ, moreover, does not rely on any substantial evidence indicating that Plaintiff pestered Dr. Moore or Dr. Mankowski to provide him with a disability opinion.

In comparison, ALJ Anschuetz assigns "great weight" to the opinions of the State agency record-reviewing physicians. *Id.* at 52. He reasons, "Although those physicians were non-examining, and therefore their opinions do not as a general matter deserve as much weight as those of examining or treating physicians, those opinions do deserve some weight, particularly in a case like this in which there exist a number of other reasons to reach similar conclusions (as explained throughout this decision)." *Id.* at 52-53.

The ALJ erred by failing to apply the same level of scrutiny to reviewing physicians' opinions as he applied to treating sources' opinions. *See Gayheart,* 710 F.3d at 379 (citing 20 C.F.R. § 404.1527(c); Soc. Sec. R. 96-6p, 1996 WL 374180, at *2 (Soc. Sec. Admin. July 2, 1996))[3] ("A more rigorous scrutiny of the treating-source opinion than the nontreating and nonexamining opinions is precisely the inverse of the analysis that the regulation requires."). Although the ALJ heavily criticized Plaintiff's treating physicians'' for their check-off questionnaires, he fails to criticize the State agency physicians for their form responses. Further, although he questions the treating

---

[3] The Social Security Administration issued Soc. Sec. R. 17-2p, effective March 27, 2017, which supersedes Soc. Sec. R. 96-6p. At the time of the ALJ's decision in this case, Soc. Sec. R. 96-6p was still in effect.

16

physicians' reasons for giving an opinion of disability, he does not acknowledge that the record-reviewing physicians—who are employed by the Social Security Administrations—may have questionable motives as well.

Accordingly, for the above reasons, Plaintiff's Statement of Errors is well taken.[4]

**B.     Remand**

A remand is appropriate when the ALJ's decision is unsupported by substantial evidence or when the ALJ failed to follow the Administration's own regulations and that shortcoming prejudiced the plaintiff on the merits or deprived the plaintiff of a substantial right. *Bowen*, 478 F.3d at 746. Remand may be warranted when the ALJ failed to provide "good reasons" for rejecting a treating medical source's opinions, *see Wilson*, 378 F.3d at 545-47; failed to consider certain evidence, such as a treating source's opinions, *see Bowen*, 478 F.3d at 747-50; failed to consider the combined effect of the plaintiff's impairments, *see Gentry*, 741 F.3d at 725-26; or failed to provide specific reasons supported by substantial evidence for finding the plaintiff lacks credibility, *see Rogers*, 486 F.3d at 249.

Under sentence four of 42 U.S.C. § 405(g), the Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." *Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991). Consequently, a remand under sentence four may result in the need for further proceedings or an immediate award of benefits. *E.g., Blakley*, 581 F.3d at 410; *Felisky v. Bowen*, 35 F.3d 1027, 1041 (6th

---

[4] In light of the above discussion, and the resulting need to remand this case, an in-depth analysis of Plaintiff's other challenges to the ALJ's decision is unwarranted.

17

Cir. 1994). The latter is warranted where the evidence of disability is overwhelming or where the evidence of disability is strong while contrary evidence is lacking. *Faucher v. Sec'y of Health & Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994).

A judicial award of benefits is unwarranted in the present case because the evidence of disability is not overwhelming and the evidence of disability is not strong while contrary evidence is lacking. However, Plaintiff is entitled to an Order remanding this case to the Social Security Administration pursuant to sentence four of § 405(g) due to the problems discussed above. On remand, the ALJ should be directed to evaluate the evidence of record, including the medical source opinions, under the applicable legal criteria mandated by the Commissioner's Regulations and Rulings and by case law; and to evaluate Plaintiff's disability claim under the required five-step sequential analysis to determine anew whether Plaintiff was under a disability and whether his application for Disability Insurance Benefits should be granted.

## IT IS THEREFORE RECOMMENDED THAT:

1. The Commissioner's non-disability finding be vacated;

2. No finding be made as to whether Plaintiff Ted Allen was under a "disability" within the meaning of the Social Security Act;

3. This matter be **REMANDED** to the Social Security Administration under sentence four of 42 U.S.C. § 405(g) for further consideration consistent with this Report and Recommendations, and any decision adopting this Report and Recommendations; and

4. The case be terminated on the Court's docket.

Date: December 20, 2017
       *s/Sharon L. Ovington*
       Sharon L. Ovington
       United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within **FOURTEEN** days after being served with this Report and Recommendations. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within **FOURTEEN** days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981).